## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2019, 9:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of C.J.H. (Minor Child),

and

B.H. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 30, 2019

Court of Appeals Case No.
18A-JT-2570

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham Judge

Trial Court Cause No.
79D03-1801-JT-8

**Tavitas, Judge.**

## Case Summary

B.H. ("Father") appeals the termination of his parental rights to C.J.H. (the "Child"). We affirm.

## Issues

Father raises a single issue on appeal, which we restate as follows:

    I. Whether the trial court properly concluded that the conditions leading to the Child's removal will not be remedied.

    II. Whether the trial court properly concluded that termination of Father's parental rights is in the Child's best interests.

## Facts

Father and Ch.H. ("Mother") are the parents of the Child, who was born in September 2015.[1] On August 25, 2016, the Tippecanoe County Office of the Department of Child Services ("DCS") received a report that Mother and Father were incarcerated following an incident of domestic violence. On August 26, 2016, DCS removed the Child on an emergency basis due to allegations of abuse and/or neglect; the Child has not returned to Mother's or

---

[1] Mother's parental rights to the Child were also terminated; however, Mother is not a party to this appeal.

Father's care since his removal. That same day, DCS filed a petition that alleged the Child was a child in need of services ("CHINS").

[4] On October 4, 2016, the State charged Father with domestic battery and offered him a pretrial diversion if Father completed the Character Restoration program. The trial court adjudicated the Child as a CHINS on November 15, 2016. Pursuant to a dispositional order entered that day, Father was required to undergo "parenting assessment and parenting education, substance abuse assessment and treatment, domestic violence assessment and education, home-based case management, individual counseling, random drug screens, and parenting time." App. Vol. II pp. 13-14.

[5] During the pendency, DCS referred Father to various service providers for counseling, supervised visitation, and programming. Father was repeatedly discharged from referrals for no-shows and cancellations. Father was also incarcerated on criminal charges multiple times during the pendency of the CHINS matter. On October 2, 2017, the State filed a petition to set a bench trial for Father's failure to complete the Character Restoration program. On October 10, 2017, Father was convicted of possession of a synthetic drug, a Class A misdemeanor; and on March 27, 2018, Father was convicted of conversion, a Class A misdemeanor.

[6] On January 21, 2018, DCS filed a petition to terminate Father's parental rights. The trial court conducted a fact-finding hearing on April 11, May 14, and June 29, 2018. DCS presented testimony of family case managers ("FCMs"), the

director of the Character Restoration Center, and various service providers. Father, who was once again incarcerated, testified on his behalf.

[7]     On September 26, 2018, the trial court entered the following findings of fact and conclusions of law:

> 1. There is a reasonable probability the conditions that resulted in removal of the child from the home or the reasons for continued placement outside the home will not be remedied. Neither parent has demonstrated the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain stability necessary to care and provide for the child.
>
> 2. Continuation of the parent-child relationships poses a threat to the well-being of the child. The child needs stability in life. The child needs parents with whom the child can form a permanent and lasting bond to provide for the child's emotional and psychological as well as physical wellbeing. The child's well-being would be threatened by keeping the child in parent-child relationships with either parent whose own choices and actions have made them unable to meet their own needs let alone the needs of the child.
>
> 3. DCS has a satisfactory plan of adoption for the care and treatment of this child following termination of parental rights. The child can be adopted and there is reason to believe an appropriate permanent home has or can be found for the child.
>
> 4. For the foregoing reasons, it is in the best interests of [the Child] that the parental rights of [Mother] and [Father] be terminated.

App. Vol. II p. 16. Father now appeals.

# Analysis

[8] Father challenges the termination of his parental relationship with the Child. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[9] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[2] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section

---

[2] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

(a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

(b) If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) That one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.
>
> (C) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(D) that termination is in the best interests of the child; and

(E) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[12] Father argues there is no evidence to support the trial court's conclusions that the conditions that led to the Child's removal would not be remedied or that continuation of the parent-child relationship poses a threat to the wellbeing of the Child.[3] Father also argues that there is no evidence that termination of Father's rights is in the best interests of the Child.

### A. Continuation of Relationship Poses Threat to Wellbeing

[13] First, Father argues there is no evidence to support the trial court's conclusion that continuation of the parent-child relationship poses a threat to the wellbeing

---

[3] Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, we need only decide if the trial court's findings support one of these two requirements. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

of the Child. When considering whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care for his [or her] child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

[14] In concluding that continuation of the parent-child relationship poses a threat to the Child's wellbeing, the trial court reached the following pertinent findings and conclusions:

> . . .
>
> 3. Investigation confirmed that Father was arrested for Domestic Battery. Both parents sustained minor injuries. Mother admitted each parent struck the other parent during this incident and disclosed a prior incident of Father pulling her hair. . . .
>
> * * * * *
>
> 11. At the onset of the CHINS case. Mother and Father maintained housing. However, the parents have essentially been homeless since approximately April 2017 after being evicted. Both parents have prior evictions. At the time of the termination hearing, . . . Father had been residing with a friend for a couple of weeks.
>
> 12. Neither parent successfully maintained employment. [ ] . . . Father reported part-time employment at $10.00 per hour.

Father also receives social security benefits of approximately $675.00 per month.

* * * * *

20. The parents only sporadically participated in home-based case management services. Case management goals included time management, organization, transportation, housing, and employment. . . . . Father also needed assistance and/or monitoring regarding medication compliance. Father is diabetic and did not take medications as prescribed. Little to no progress was made toward these goals. The parents were discharged from case management services at eight (8) different agencies for lack of attendance.

21. The parents failed to consistently attend scheduled parenting time which remained fully supervised throughout the CHINS case. At times, the parents were prepared with supplies. At visits attended, interactions between the parents and the child were appropriate. The parents were discharged from six (6) separate agencies for lack of attendance. Father last saw the child in April 2017. [ ] The parents failed to re-engage in supervised parenting time services after the last referral in August 2017.

App. Vol. II pp. 13, 14-15.

[15]   DCS presented testimony of various service providers, who confirmed that they had no alternative, but to discharge Father from services for his inconsistency, no-shows, and failure to otherwise engage in services. During its case in chief, DCS presented the following evidence: Aliesha Walker, who served as FCM regarding the Child, testified that Father was largely unsuccessful regarding DCS's case plan and failed to make significant progress regarding reunification

goals. Specifically, Walker testified that Father: (1) failed to complete home-based case management because he was not "consistent with services" and was "always cancelling appointments"; (2) failed to complete Character Restoration "cause he was always missing it"; (3) was "not consistent" with random drug screens; (4) failed to maintain consistent housing and steady employment; and (5) "was not consistent" with visitation and gave "a lot of . . . excuses more than reasons [for] why he would miss visitation." Tr. Vol. II pp. 81, 82, 84, 85.

[16]    Likewise, FCM Jamie Johansen testified that Father was routinely discharged by service providers for his lack of communication and engagement. Johansen testified that Father attended only twenty-one of thirty-five scheduled supervised visits; and DCS did not "[see] enough consistency to progress" beyond fully supervised visits. *Id*. at 165. Johansen testified further that DCS made eight referrals for case management and that Mother and Father were discharged eight times. Johansen also testified that Father: (1) failed to complete the twenty-six-week Character Restoration domestic violence course; (2) completed only ten of fifty-two drug screens; (3) tested positive for marijuana on April 11, 2018; and (4) Father has been homeless since April 2017.

[17]    Christina Pointer, formerly of Selah Academy, testified that Father's supervised visitation referral was terminated in April 2017 after Father missed three consecutive visits. Morgan Salazar, formerly of Home-based Goal Focused Counseling for Children and Families, testified that Father was "being late for visits, no-showing, [and] canceling." *Id*. at 122. Lisa Swaney, who supervised

Mother's and Father's visitation in early October 2016, testified that Father's supervised visitation was terminated in late November 2016 "due to several no-shows [and] early cancellations," including seven canceled visits and no-shows in a one and one-half month period. *Id.* at 125, 126. Home-based mental health therapist Melissa Cobarrubias testified that she scheduled six sessions with Father, who no-showed for four.

[18] In the same vein, Janette Jackson of People Makers testified that Father was referred for home-based casework and supervised visits in April 2017 and that People Makers discharged him two months later. Jackson also testified that Father exhibited "unwillingness" to participate in services, made "a lot of excuses" regarding his lack of employment, and refused to take court-ordered medication for his diabetes. *Id.* at 146.

[19] Tracey Winger, formerly a case manager with Arisings, testified that "we rarely were able to make . . . continual weekly visits" due to "a lot of reschedules and no-shows." *Id.* at 132. Winger testified that Father indicated "that [he was] actively seeking [employment]" but did not get a job while Winger was working with him. *Id.* at 133. Arisings eventually discharged Father in April 2017 after six or seven no-shows and following an exchange with Father regarding DCS' involvement in his life that left Winger feeling "intimidated." *Id.* at 136.

[20] DCS presented evidence of Father's habitual patterns of apathy, lack of initiative, and self-destructiveness. We are especially struck by Father's refusal to acknowledge or address the domestic violence issue that resulted in the

Child's removal; Father's disinclination to take his diabetes medication; his rejection of DCS' efforts to assist him with parenting and life skills; and his inability to secure and maintain housing and employment during the two-year pendency of the DCS action.

[21] Based on the foregoing, we find that DCS demonstrated that there is a substantial probability of future neglect or deprivation if the parent-child relationship is allowed to continue. Accordingly, we conclude that sufficient evidence exists to support the trial court's finding that continuation of the parent-child relationship poses a threat to the wellbeing of the Child.

## B. Best Interests of Child

[22] Next, Father argues that the trial court erred in concluding that termination of his parental rights is in the best interests of the Child. Father argues, "There is a bond between Father and his child, and it would not be in [the Child's] best interests to have his relationship with this biological parent severed. Case law does not require that persons be model parents." Appellant's Br. pp. 15-16.

[23] In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental,

and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[24]  Here, in determining that termination of the parent-child relationship was in the Child's best interests, the trial court reached the following findings and conclusions, including findings already stated above:

> . . .

> 11. At the onset of the CHINS case, Mother and Father maintained housing.  However, the parents have essentially been homeless since approximately April 2017 after being evicted.  Both parents have prior evictions.  At the time of the termination hearing, Mother reported residing between a friend's home and the LUM Shelter and Father had been residing with a friend for a couple of weeks.

> 12. Neither parent successfully maintained employment.  [ ] Father reported part-time employment at $10.00 per hour.  Father also receives social security benefits of approximately $675.00 per month

> \* \* \* \* \*

> 17. The parents have never addressed domestic violence issues.  DCS and service providers observed signs of power and control issues between the parents.  Mother and Father remained in a relationship throughout most of the CHINS case although they did not always reside together.

18. Even though Mother reported more than just a few prior incidents of domestic violence and that Father wanted to know Mother's whereabouts and actions at all times, she struggled to identify herself as a victim of domestic violence.  * * * * *

19. Father failed to complete domestic violence education at Character Restoration.  Father was unsuccessfully discharged from individual therapy after attending only two (2) of six (6) scheduled sessions.  At the time of the termination hearing, Father was still unable to acknowledge the nature and extent of the domestic violence incident resulting in removal of the child from the home.  Father still denied any physical contact and denied any injury.

20. The parents only sporadically participated in home-based case management services.  Case management goals included time management, organization, transportation, housing, and employment.  [ ]  Father also needed assistance and/or monitoring regarding medication compliance.  Father is diabetic and did not take medications as prescribed.  Little to no progress was made toward these goals.  The parents were discharged from case management services at eight (8) different agencies for lack of attendance.

21. The parents failed to consistently attend scheduled parenting time which remained fully supervised throughout the CHINS case.  [ ]  The parents were discharged from six (6) separate agencies for lack of attendance.  Father last saw the child in April 2017. Mother last saw the child in July 2017.  The parents failed to re-engage in supervised parenting time services after the last referral in August 2017.

* * * * *

23. CASA, Verdell Releford, supports termination of parental rights in the best interests of the child. CASA noted the parents have had no contact with the child in approximately a year. The parents have made no progress toward reunification. The child is bonded with the foster placement and has no special needs. The child is adoptable even if the current foster placement is unable to adopt for any reason.

App. Vol. II pp. 14-16.

[25] At the fact-finding hearing, DCS' FCMs testified as follows regarding Father's attitude regarding his domestic violence issue: FCM Johansen testified that Father refused to even acknowledge the domestic violence incident that prompted DCS' removal of the Child; denied having any domestic violence issues; deflected blame to others; and rejected DCS' services aimed toward curbing domestic violence. Regarding the incident that prompted DCS' involvement, Johansen testified:

> . . .[ ] on August 25, 2016, [ ] both parents were incarcerated. []
> [P]olice showed up to their home due to a domestic violence incident, um, in which the mother and father were fighting with each other. [T]he story about what has actually happened from the parents has changed, um, but both parents . . . sustain[ed] some minor injuries. [L]et's see, um, mother reported that the father threw a heater at her head and was hitting and kicking her. [S]he also admitted to striking . . . [Father] in the face, um, when [Father] had pulled the child from the Pack-N-Play by [the Child's] arm.

Tr. Vol. II p. 155.

[26]     Asked about her ongoing concerns, FCM Johansen testified that, in addition to unaddressed issues of "manipulation and domestic violence" in Mother's and Father' relationship, she was concerned that:

> . . . [Mother and Father have] been chronically homeless since around April 2017. [T]hat means they don't have a stable home to care for a child. [T]hey've been chronically unemployed. That means they don't have the means to support said child. [T]hey, um, they've demonstrated inability to take care of their own needs []as presented through, [Father] refusing to take his [insulin] medication. [H]ow would they meet the needs of a child if they can't take care of themselves[?]

Tr. Vol. II p. 170.

[27]     Next, FCM Walker testified:

> . . . [Father] wanted to blame DCS for everything and he felt that his child shouldn't be, um, removed. So, it was a constant, um, battle with him in not accepting why his child was removed and to get him the help that he needed for why his child was removed. So, um, he would become very argumentative, um, and did not want to cooperate with services.

*Id*. at 86.

[28]     Harry Heyer, director of the Character Restoration Center, testified that Father failed to regularly attend and participate in classes; was "violated out per program policy" three separate times for missing consecutive sessions; and failed to meet the program objective of treating Father's "problematic patternistic behaviors." *Id*. at 23-24, 27. Heyer testified that consecutive

program attendance is critical because data on domestic violence establishes that, after missing two consecutive classes, "[attendees'] cognition goes back to the same problematic thinking" that prompted the referral. *Id.* at 23.

[29] Mother testified that the August 2017 domestic violence incident "unfolded in front of [the] child," who was eight months old. *Id.* at 64. Mother testified that she identifies as a domestic violence victim; that she and Father had multiple prior physical altercations before the August 2017 incident; and that she was "not continuing a relationship [with Father]" because it is unhealthy to do so. *Id.* at 67.

[30] DCS presented evidence that Father simply refused to address his domestic violence issues throughout the two-year CHINS pendency. Coupled with Father's failure to participate in services, his failure to secure and maintain housing and employment during the pendency of the CHINS action, his chronic incarcerations, and the fact that the Child has lived with—and thrived in the care of—the same pre-adoptive foster family for the nearly-three-year period since the Child's removal, we find that the totality of the evidence supports the trial court's finding that termination of the parent-child relationship is in the Child's best interests. As the trial court stated:

> The child needs stability in life. The child needs parents with whom the child can form a permanent and lasting bond to provide for the child's emotional and psychological as well as physical wellbeing. The child's well[]being would be threatened by keeping the child in parent-child relationships with either

parent whose own choices and actions have made them unable to meet their own needs let alone the needs of the child.

App. Vol. II p. 16. We agree. Ever mindful of the Child's need for permanency, we find that the Child's emotional and physical development would be threatened if the parent-child relationship is allowed to continue. We reiterate that a trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *K.T.K.*, 989 N.E.2d at 1235. Based on the foregoing, we cannot say that the trial court's finding that termination of Father's parental rights is in the Child's best interests is clearly erroneous.

## Conclusion

[31]   Sufficient evidence supports the termination of Father's parental rights. We affirm.

[32]   Affirmed.

Crone, J., and Bradford, J., concur.